IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GUY WASHINGTON,           )
                                  )
         Plaintiff,         )
                                  )    CIVIL ACTION NO. _____
     v.                   )
                                  )
LIFE UNIVERSITY,       )
DR. MARC SCHNEIDER, and )
DR. JANA BREDESON    )
                                  )    <u>JURY TRIAL DEMANDED</u>
        Defendants.    )

## COMPLAINT

COMES NOW Plaintiff Guy Washington ("Plaintiff") and files this Complaint against Defendants Life University (hereinafter "Defendant Life University"), Dr. Marc Schneider (hereinafter "Defendant Dr. Schneider") and Dr. Janna Bredeson (hereinafter "Defendant Dr. Bredeson") by and through his undersigned counsel, seeking recovery of damages and other appropriate relief for employment discrimination, respectfully showing the Court as follows:

## PRELIMINARY STATEMENT

### 1.

This is a civil action brought on behalf of Plaintiff Guy Washington ("Plaintiff") against Defendants Life University, Dr. Schneider, and Dr. Bredeson for race discrimination and retaliation in violation of Title VII of the US Civil Rights

Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981 ("Section 1981") together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## THE PARTIES

2.

Plaintiff is a Black male citizen of the United States who resided in Atlanta, Georgia at all relevant times. Plaintiff was subject to race discrimination and retaliation that resulted, ultimately, in his constructive discharge from Defendant Life University.

3.

Plaintiff is and was, at all times relevant herein, Defendant Life University's "employee" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII, and Section 1981.

4.

Upon information and belief, at all times herein, Defendant Life University, (hereinafter "Defendant Life University") was and is a corporation registered to do business in Georgia. Upon information and belief, Defendant Life University is located at 1269 Barclay Circle, Marietta, Georgia 30329.

5.

Defendant Life University is and was, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws, including, but not limited to, Title VII, and Section 1981.

6.

Defendant Dr. Marc Schneider is a Caucasian/white male and at all relevant times herein, was employed by Defendant Life University as the Vice-President of Student Affairs at its1269 Barclay Circle, Marietta, Georgia 30329 location. Upon information and belief, Defendant Dr. Marc Schneider is a resident of the state of Georgia and is subject to this Court's jurisdiction.

7.

Defendant Dr. Marc Schneider was, at all relevant times herein was employed by Life University in a supervisory and managerial capacity and supervised and managed Plaintiff.

8.

Defendant Dr. Jana Bredeson is a Caucasian/white female and at all relevant times herein, was employed by Defendant Life University as the Dean of Students at its 1269 Barclay Circle, Marietta, Georgia 30329 location. Upon information and belief, Defendant Jana Bredeson is a resident of the state of Georgia and is subject

to this Court's Jurisdiction.

9.

Defendant Dr. Jana Bredeson was, at all relevant times herein was employed by Defendant Life University in a Supervisory and Managerial capacity and Supervised and Managed Plaintiff.

**JURISDICTION, VENUE, AND PROCEDURAL REQUIREMENTS**

10.

This is a civil action for monetary damages and such other relief as the Court deems just and proper based upon Defendants' discrimination and retaliation against Plaintiff based on race, and Defendant's constructive discharge of Plaintiff.

11.

This Court has Jurisdiction over this action under 42 U.S.C.A. § 2000(e) et. seq., and under 28 U.S.C.A. §§1331 and 1343(4).

12.

Venue for this action properly lies in this district pursuant to 28 U.S.C § 1391.

13.

All conditions precedent to filing the instant action have been fulfilled. On or about January 19, 2023, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about September 29,

4

2023, the EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of his Notice of Right to Sue.

## DEMAND FOR JULY TRIAL

### 14.

Plaintiff hereby demands a jury trial of each count of the complaint.

## FACTUAL BACKGROUND

### 15.

Respondent Life University was founded in 1975 as a private, residential college for training chiropractors. It occupies 110 acres and is the largest chiropractic college in the world. Life University provides residential housing and on-campus dining, among other amenities, for its students.

### 16.

In spring 2021, in response to observed inefficiencies and operational problems, Life University created an office for Auxiliary Services; it advertised a new role encompassing oversight of student dining, conference services, housing and residential life, card services, shuttles, bookstore and vending. At the time, there were a handful of front-line workers in place within the Student Affairs division but no centralized, coherent leadership.

17.

Jeremy Faulk ("Mr. Faulk"), a Black man, was hired as Director of Auxiliary Services at Life University on March 18, 2021. Mr. Faulk reported to Defendant Dr. Bredeson, the Dean of Students. Aside from Mr. Faulk, Student Affairs senior management consisted of all white women including Defendant Dr. Bredeson, Dean of Students; Melissa Waters, Senior Director of Administrative Services; and Lisa Ruben, Senior Director of Campus Activities.

18.

In July 2021, Mr. Faulk began the task of assembling a team and developing novel protocols for the office. In August 2021, Plaintiff was hired as a temporary worker in the Student Affairs division through the employment agency, Express Pros of Marietta, Georgia.

**Defendant Dr. Schneider Resists Hiring Plaintiff as Operations Manager**

19.

In late fall 2021, Mr. Faulk began the process of hiring for the position of Operations Manager; he requested an impartial hiring committee from Human Resources to identify qualified individuals for the role.

20.

Mr. Faulk encouraged Plaintiff to apply for the position and to become a permanent member of the team. During the summer of 2021, while stationed in

6

housing operations at the student affairs desk and later in the Housing & Residence Life office, Plaintiff established himself as highly competent and reliable.

21.

During his tenure there was an HVAC system failure and a major mold remediation issue within Defendant Life University's dormitories. Plaintiff professionally and successfully managed the student room reassignments and coordinated and crafted the communications to the affected population.

22.

Plaintiff was an experienced professional with a degree in Business Management from the Borough of Manhattan Community College; he had worked in accounting, operations and legal roles in government and in some of the nation's top law firms.

23.

Defendant Dr. Schneider, Vice-President of Student Affairs, initially rejected Plaintiff for the role based upon ambiguous and subjective criteria, saying merely that Plaintiff was not a good "culture fit." By this time, Plaintiff had already been successfully working at the University for several months. Upon information and belief, Defendant Dr. Schneider had concluded that Plaintiff was not a sufficiently obedient Black man to become a permanent employee of Defendant Life University. Upon information and belief, Defendants Drs. Schneider and Bredeson only hired

Black candidates that they perceived as deferential to the racial hierarchy, regardless of the candidates' qualifications.

24.

Defendant Dr. Schneider was disdainful of Black candidates proposed by the search committees and told the committee to look for other candidates. Defendant Dr. Schneider found many ways to delay and complicate the hiring process for staff in Auxiliary Services, the only division under Black leadership. White comparators told Mr. Faulk that the comparators were given latitude to hire direct reports and were fully supported by Defendant Dr. Schneider in doing so.

25.

Despite that Defendant Dr. Schneider made clear that he did not personally approve of Plaintiff, Plaintiff was ultimately hired out of necessity and his first day of work as Operations Manager at Defendant Life University was February 14, 2022.

**The Presence of Black Colleagues Results in "White Flight"**

26.

By late fall 2021, Mr. Faulk had hired several new employees within Auxiliary Services. In a phenomenon akin to residential white flight,[1] the preexisting white staff upon information and belief no longer wanted to work in an office now staffed with Black employees.

---

[1] https://en.wikipedia.org/wiki/White_flight

27.

Madoline Huff ("Ms. Huff"), one of those white staff members, had already resisted Mr. Faulk's leadership. She now began to complain about Plaintiff, another Black man, this time reportedly because Plaintiff made her feel "uncomfortable." These vague complaints were not accompanied by any concrete criticisms but were upon information and belief made on account of, and referring to, Plaintiff's race.

28.

White employees Ms. Huff and Charlotte Davenport both resigned during the fall of 2021; upon information and belief, they left the Auxiliary Services office because they did not want to work with Black employees who were not unduly deferential to the racial hierarchy at Defendant Life University. Ms. Huff was brought on as a consultant working remotely, physically away from the rest of the staff, for a few additional months.

**Defendant Dr. Schneider Micromanages and Foments Discord Within the Only Black Team in the Division**

29.

Defendant Dr. Schneider was explicit about his concern that Mr. Faulk's staff was comprised of Black employees. He complained that Mr. Faulk's office was not "diverse," (meaning did not have enough white members). Defendant Dr. Schneider also alleged aloud that Mr. Faulk hired all of Mr. Faulk's "homegirls and

homeboys," referring to Plaintiff and other Black new-hires.[2] Referring to seasoned Black professionals as "home girls and home boys," and implying that all Black people know each other through a "street" affiliation, and that that affiliation was the basis for hiring Plaintiff and other Black professionals is overtly race-related, discriminatory conduct.

30.

During Defendant Life University's holiday party in December 2021, Defendant Dr. Schneider announced to approximately fifty employees that he hadn't expected Mr. Faulk would last as long as he had as an employee, undermining Mr. Faulk's authority as a Black head of the division. Defendant Dr. Schneider then added, "I don't know how long he's actually going to make it. That's to be determined!" No white comparators experienced comments like this from Defendant Dr. Schneider during their tenure at Defendant Life University.

31.

Defendant Dr. Schneider's comments changed the atmosphere from a fun, lighthearted event to a dark reminder that at any moment Black professionals at Defendant Life University, even someone in a Directorship like Mr. Faulk, could be

---

[2]https://www.dictionary.com/browse/homegirl#:~:text=Homegirl%20is%20a%20slang%20term%20that's%20always%20used%20informally.,African%20American%20and%20Latinx%20community.

terminated and that Black professionals at Defendant Life University needed to know their place in the racial hierarchy in order to keep their jobs.

32.

To Plaintiff, this conduct evoked a similar historical practice which occurred during slavery in America, known to some as "buck breaking.[3]" At times, slave masters physically punished or ridiculed the stronger males in front of other slaves in order to instill fear. Plaintiff reasonably experienced Defendant Dr. Schneider's behavior as an attempt to intimidate the entire Black team by demonstrating a show of racially-motivated disrespect towards Mr. Faulk, constituting a hostile work environment.

33.

Once Mr. Faulk's team was onboarded in January 2022, Defendant Dr. Schneider announced that he would insert himself into the management of the entire Black team, the only all-Black team at Defendant Life University. Defendant Dr. Schneider began to unduly insert himself in operations, unilaterally intervening periodically without warning, and disrupting reporting relationships.

34.

Defendant Dr. Schneider also began to hold private meetings with Plaintiff and give Plaintiff directions without consulting with Plaintiff's supervisor, creating

---

[3] https://en.wiktionary.org/wiki/buck_breaking

an uncomfortable and precarious working environment where Plaintiff could be pitted against Plaintiff's direct supervisor, Mr. Faulk. Defendant Dr. Schneider even told Plaintiff to stop communicating with Mr. Faulk and run everything through Defendant Dr. Schneider. These practices fomented fear and confusion among the Black team of which Plaintiff was a part.

35.

Defendant Dr. Bredeson, the other supervisor for Auxiliary Services, provided yet another layer of white supervision. Defendant Dr. Bredeson caustically berated members of Mr. Faulk's Black team in a manner that was overtly hostile and to which non-black members of the team were not subjected, evincing racial animus.

### Doe Avoids Scrutiny By "Knowing Her Place" Within the Racial Hierarchy at Defendant Life University

36.

Upon information and belief, Jane Doe, whom Plaintiff hired in November 2021, recognized the rift between white Supervisors, Defendant Dr. Bredeson and Defendant Dr. Schneider at Defendant Life University, and the employees of color on the staff of Auxiliary Services. Jane Doe saw the harassment and race-based challenges that other Black employees had faced. Upon information and belief, Jane Doe realized that if she wanted to maintain her job at Defendant Life University, she

would need to "know her place." By doing so, she managed to stay off of Defendant Dr. Schneider's radar and in his "good graces."

37.

By complying with Defendants' expectations for how Black employees should behave towards white employees, Jane Doe would later save herself from the fate that would befall the rest of the Black staff.

**Defendant Life University Refuses to Protect Black Employees**

38.

The hostile work environment at Defendant Life University was unsustainable for everyone on the team and some officially reported their mistreatment to senior Management and Human Resources.

39.

In late February, Defendant Dr. Schneider and Defendant Dr. Bredeson were removed from their supervisory roles over Auxiliary Services pending an investigation into their behavior. The office operated more smoothly without their involvement and under the supervision of acting provost, Dr. Tim Gross ("Dr. Gross").

40.

During the months when an investigation was supposed to be taking place, no one ever approached Plaintiff for an interview so that he might share the ways in

which Defendants Dr. Schneider and Defendant Dr. Bredeson had evinced racial animus, and created a hostile work environment for him.

41.

At the end of May 2022, the team learned that, despite the multiple complaints and lack of meaningful investigation, Defendant Life University internally issued a finding that there was no evidence of discrimination and that Defendants Drs. Schneider and Bredeson would be restored to their positions, poised to resume micromanaging the Black team.

42.

Mr. Faulk reminded Defendant Life University that the team suffered a hostile work environment under Defendant Dr. Schneider and Defendant Dr. Bredeson and could not be expected to continue to work under them. The Black professionals at Defendant Life University, including Plaintiff, were not given any options but to tolerate the racially-motivated disparate and demeaning treatment.

43.

Mr. Faulk explained to Plaintiff that Mr. Faulk could not survive working in the racist environment and had to protect his mental health and humanity by leaving his role as the only Black Director at Defendant Life University.

44.

Mr. Faulk was constructively discharged from Life University on May 17, 2022 and tendered his written resignation.

**Emboldened by Defendant Life University, Defendant Dr. Schneider**
**<u>Escalates Discrimination Against Black Employees</u>**

45.

The week after Mr. Faulk was constructively discharged, in May 2022, Defendant Dr. Schneider met with the remaining staff to set "new ground rules." Defendant Dr. Schneider proudly announced that he knew he was offensive; given that he had just avoided any consequences for driving out Mr. Faulk. Defendant Dr. Schneider's tone evinced that he did not intend to stop being "offensive" and that Black professionals working under him at Defendant Life University had no choice but to accept different and worse treatment than non-Black professionals.

46.

Defendant Dr. Schneider announced that the Black team would now be reporting to him. Defendant Dr. Schneider then told the team that he did not want anyone to ever mention Mr. Faulk's name.

47.

Defendant Dr. Scheider misleadingly asked the team what they expected from him as a leader. Plaintiff said that he would like more grace extended to the team,

meaning less undue scrutiny on account of race, because the Black team had done a great job dramatically improving the problems in housing and residential life that pre-dated their hiring.

48.

Defendant Dr. Schneider angrily responded that, he would not extend grace to "people who don't know what they are doing," upon information and belief, referring to Black people.

49.

After that meeting, any mention of Mr. Faulk or past practices would send Defendant Dr. Schneider into a tailspin of irrational and racially-motivated anger that was never, upon information and belief, directed toward white employees.

**Defendant Dr. Schneider Ultimately Dismantles Auxiliary Services, the Only Black team at Defendant Life University**

50.

Soon after Mr. Faulk was constructively discharged, Plaintiff heard that Defendant Dr. Schneider was planning on firing everyone whom Mr. Faulk had hired. Ms. Doe told Plaintiff in the cafeteria that Plaintiff should watch his back because "[Defendants] are coming for" him and "want [to take away] his job."

51.

Defendants Drs. Schneider and Bredeson began not only to personally oversee every aspect of Plaintiff's work but also to surveil Plaintiff and other Black team members. Defendants even began to monitor Plaintiff and other Black team members on camera. Because overall housing operations had improved so much -- the housing inbox was improving, housing complaints had decreased, and housing occupancy rates had increased – and because no white employees were subject to surveillance, this behavior could only be racially motivated. Defendants Drs. Schneider and Dr. Bredeson had not surveilled white comparator Ms. Huff or other white employees.

52.

On one occasion, while Plaintiff was attending the StarRez - Digital Connect User conference from July 10-12, 2022, an issue arose in the office. A Black team member, Uyikhosa Idahor ("Ms. Idahor"), addressed the issue swiftly, but Defendant Dr. Schneider intervened and insisted that Ms. Idahor contact Plaintiff and pull him out of the conference in California. Upon information and belief, Defendant Dr. Schneider was seeking to create unnecessary confusion and discord among the Black team to position the Black team for failure and to create a pretext for firing them. Defendant Dr. Schneider's conduct caused Plaintiff to lose the opportunity to derive and implement critical information from the tech conference.

53.

At the same time, during a first-time Camps and Conference hosted on Defendant Life University grounds by several departments under Student Affairs, Defendant Dr. Schneider was aggressively and unduly critical of Ms. Idahor, presumably on account of her race. Defendant Dr. Schneider hovered over the Black professionals, surveilled them, and otherwise directed animus toward them.

**Defendant Dr. Schneider Ensures No More Black Employees Are Hired**

54.

As the team looked to rebuild, Defendant Dr. Schneider said he did not want any new employee who might be connected "in any way" to Mr. Faulk and upon information and belief, due to Defendant Dr. Schneider's racist assumption that all Black people know each other as "home girls and home boys," meant that no more Black professionals were to be hired. Upon information and belief, Defendant Dr. Schneider did not want to hire any employees that might not be deferential to whites and to a racial hierarchy.

55.

Furthermore, Defendant Dr. Schneider said he did not want any potential employees from an HBCU, which would be any student who attended a historically Black College or University, most likely to also be Black, a policy that would disparately impact Black job candidates.

56.

In May 2022, the search for a Residence Life Coordinator began. After the search committee selected Jamesha Purdiman ("Ms. Purdiman"), a Black woman, the team was informed that she had declined the position.

57.

Upon information and belief, Ms. Purdiman was discouraged and ultimately declined the job due to her conversations with individuals on the search committee, which included Defendants Drs. Bredeson and Schneider.

58.

On July 14, 2022, the search committee selected another Black female, Alesha Harrington ("Ms. Harrington"), for the position. During her interview with Defendant Dr. Schneider, Defendant Dr. Schneider asked Ms. Harrington if she knew Jeremy Faulk and Uyikhosa Idahor. Though Ms. Harrington said she did not know Mr. Faulk and knew Ms. Idahor while in college, Defendant Dr. Schneider still refused to endorse the search committee's selection of Ms. Harrington. Defendant Dr. Schneider said that one of his main apprehensions about hiring Ms. Harrington was that she attended an HBCU, or historically Black college or university, North Carolina Central University, bearing out the proposition that the "no HBCU candidates" policy would and disparately and negatively impact Black applicants. Ultimately, Ms. Idahor pleaded with Defendant Dr. Schneider to focus

on the candidate's job qualifications rather than her alma matter, and reminded Defendant Dr. Schneider that the office desperately needed support.

**Defendant Life University Disproportionately Overcharges Black Students**

59.

During the last week of disenrollment during summer quarter, Defendant Dr. Schneider directed Plaintiff to aggressively overcharge a group of Black students with breakage fees. The early termination clause of the housing's license agreement normally called for a breakage fee charge to be applied to a student's account upon cancellation or withdrawal.

60.

On Friday, July 29, 2022, Plaintiff emailed Defendant Dr. Schneider to protest the unfairness of penalizing these students because he had observed Defendant Dr. Schneider make exceptions to the breakage policy for white students. Plaintiff explained that the Black students being penalized had experienced hardship or other extenuating circumstances which could excuse their cancellation or withdrawal. Defendant Dr. Schneider nonetheless denied the Black students the same due process review of their lease breakage and consideration that was afforded to white students.

61.

Soon after Plaintiff protested the discriminatory treatment of students, Defendant Dr. Schneider told Ms. Idahor, referring to Plaintiff, that Life

University "made a mistake" by hiring the "wrong person," presumably a continuation of Defendant Dr. Schneider's discriminatory "buck breaking" practice of undermining a prominent Black male to intimidate other Black individuals.

62.

Ms. Idahor pressed Defendant Dr. Schneider to explain, given that housing issues had improved since Plaintiff began at Life University. Defendant Dr. Schneider could not provide a concrete response, saying there was "just something about [Plaintiff] that he didn't like and rhetorically commented that "he just did not know if [Plaintiff] was qualified to be in the position," again similar treatment to that he perpetrated against Mr. Faulk.

**Defendant Life University Fires Five Black Employees on the Same Day,
Including Plaintiff**

63.

Upon information and belief, Defendants Dr. Schneider and Dr. Bredeson could no longer tolerate that Auxiliary Services was staffed with competent, all Black professionals that would advocate on their own behalf and on behalf of all students, including Black students. The Defendants had wanted only namesake, token Black employees who were obedient and deferred to a retrograde racial hierarchy; upon information and belief, Defendants did not want employees who would question when Defendants were enacting discriminatory policies and

practices whether the disparate treatment and impact effected Black staff or Black students.

64.

On August 1, 2022, Defendant Dr. Schneider and HR representative, Monica Ward ("Ms. Ward"), terminated five Black employees in the Auxiliary Services office absent any performance deficiencies to warrant the terminations.  Instead, the termination of five Black professionals was the fruits of disparate impact and treatment on account of race and racially-motivated policy.

65.

First, Defendant Dr. Scheider fired Ms. Idahor, struggling to come up with even pretextual reasons for the termination. Ms. Idahor protested that she was never given any notice of sub-standard performance and provided documentation that she had met all of her monthly targets and received nothing but positive feedback. Defendant Dr. Schneider then said that the reason Ms. Idahor was being terminated is that she had not fired Plaintiff, but Ms. Idahor had never been instructed to fire Plaintiff and felt that doing so without a legitimate business reason would have been an extension of Defendants' discriminatory policies and practices.

66.

Plaintiff had already been sent a meeting invitation earlier in the day to meet with Defendant Dr.  Schneider within an hour of Ms. Idahor and was also summarily

fired. Defendant Dr. Schneider purported to terminate Plaintiff for pretextual performance deficiencies, many of which were inherited from the previous director Madoline Huff, a white woman, who had not been terminated by Dr. Schneider for these same issues.

67.

Next, Housing Project Coordinator Jared Long, a Black man, was terminated from his position.

68.

Next, Housing Residence Life Facilities Service Technician, Harold McGirt, a Black man, was terminated from his position.

69.

Finally, Housing Residence Life Facilities Service Technician, Zaron Gray, a Black man, was terminated from his position too.

70.

In total, on a single day, Defendant Dr. Schneider disposed of five full and part-time Black employees from the team for no reason but for their race.

71.

Defendant Dr. Schneider said that he wanted to "clean house" of most of Mr. Faulk's team, all of whom were Black, regardless of their performance.

## COUNT I

*(Title VII Race Discrimination as to Defendant Life University)*

72.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

73.

Defendant Life University has discriminated against Plaintiff in violation of Title VII by subjecting him to different treatment on the basis of his race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant Life University's wrongful conduct.

74.

Defendant Life University has discriminated against Plaintiff by treating him differently from and less preferably than similarly situated, non-Black employees and by subjecting him to disparate terms and conditions of employment on the basis of his race as well as to a hostile work environment.

75.

Defendant Life University's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

76.

By reason of Defendant Life University's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII. Plaintiff shall seek attorney's fees and punitive damages.

## COUNT II
*(Title VII Retaliation as to Defendant Life University)*

77.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

78.

Plaintiff repeatedly reported to Defendant Life University about Defendant Life University's discriminatory treatment.

79.

In retaliation, Defendant Life University subjected Plaintiff to a series of adverse employment actions including, but not limited to, subjecting Plaintiff to disparate terms and conditions of employment, and wrongful termination of Plaintiff's employment.

80.

Defendant Life University's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

81.

As a result of Defendant Life University's conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

82.

By reason of Defendant Life University University's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII. Plaintiff shall seek attorney's fees and punitive damages.

**COUNT III**
*(Race Discrimination in Violation of 42 U.S.C. § 1981, Against All Defendants)*

83.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

84.

At all times relevant to this complaint, Plaintiff and Defendants were parties to an employment agreement under which Plaintiff, Defendant Dr. Schneider, and Defendant Dr. Bredeson worked for Defendant Life University and under which Defendants Drs. Schneider and Bredesen directly supervised Plaintiff at the direction of Defendant Life University.

85.

42 U.S.C. § 1981 prohibits Defendants from discriminating against Plaintiff on the basis of race with regards to the making and enforcing of their employment agreement.

86.

Defendants have discriminated against Plaintiff in violation of 42 U.S.C. § 1981, by subjecting him to different treatment on the basis of his race.  Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants' unlawful conduct.

87.

Defendants have discriminated against Plaintiff by treating him differently from and less preferably than similarly situated Caucasians/white and non-Black employees and by subjecting Plaintiff to disparate terms and conditions of employment on the basis of his race in violation of 42 U.S.C. § 1981.

88.

The above-pled discriminatory conduct toward Plaintiff, including but not limited to, Defendant's discriminatory constructive discharge of Plaintiff based on race constitute unlawful race discrimination against Plaintiff in the terms and conditions of his employment in violation of 42 U.S.C. § 1981.

89.

Defendants' conduct was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

90.

By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981. Plaintiff shall seek attorney's fees and punitive damages.

## **COUNT IV**
*(Retaliation in Violation of 42 U.S.C. § 1981, as to All Defendants)*

91.

Plaintiff incorporates by reference all of the preceding paragraphs of the Complaint.

92.

Plaintiff was an employee of Defendant Life University and is protected by 42 U.S.C. § 1981 from retaliation and retaliatory discharge.

93.

Plaintiff complained to Defendants about the race discrimination he was subjected to during his employment and protested the harassment.

94.

Plaintiff's complaints were ignored and discouraged by Defendants.

95.

Plaintiff's protestation and complaining of the race discrimination he was subjected to during his employment and to the instructions to carry out discriminatory policies and practices toward students at Defendant Life University was protected activity under 42 U.S.C. § 1981.

96.

Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race discrimination.

97.

Because he protested Defendant Life University's unlawful action, hostile work environment, and discriminatory policies and practices, Plaintiff was subjected to retaliation.

98.

The retaliation substantially interfered with the employment of Plaintiff and created an intimidating and offensive work environment in violation of 42 U.S.C. § 1981.

99.

Defendants knew and should have known about the retaliation and the effect

it had on Plaintiff's employment and Defendants failed to take any action to stop the retaliatory conduct.

100.

As a direct, proximate, and causal result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due.

101.

Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of his rights to be free from discrimination, and great humiliation, which has manifested in serious emotional distress.

102.

As a further direct, proximate, and causal result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about his future and his ability to support himself and his family, harm to his employability and earning capacity, painful embarrassment among his family, friends, and co-workers, damage to his good reputation, disruption of his personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

103.

By reason of Defendants' retaliation, Plaintiff is entitled to all remedies

available for violations of 42 U.S.C. § 1981. Plaintiff shall seek attorney's fees and punitive damages.

**COUNT V**

*(Punitive Damages and Expenses of Litigation, Against All Defendants)*

104.

Plaintiff incorporates by reference all of the proceeding paragraphs of the Complaint.

105.

The actions of Defendants complained of herein evidence such willful misconduct, wantonness, malice, oppression, and an entire want of care which would raise a presumption of conscious indifference to the consequences thereof. Such conduct was committed with reckless indifference to Plaintiff's federally protected rights so as to make appropriate the imposition of punitive damages on the Defendants.

106.

An award of reasonable attorneys' fees and costs expended by Plaintiff in the prosecution of this civil action is also appropriate in this civil action in accordance with Title VII and other applicable law.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

A.     On Count I, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

B.     On Count II, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

C.     On Count III, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

D.     On Count IV, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

E.     On Count V, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $1,000,000.00;

F.      Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Respectfully submitted this 19th day of December, 2023.

**L F Barnes Law LLC**

*/s/ L'Erin Wiggins*

L'Erin Wiggins, Esq.
Georgia Bar No. 141797
P.O. Box 250464
Atlanta, Georgia 30325
Tel: (404) 680-6498
Fax: (404) 393-5763
Email: lerin@lfbarneslaw.com

**GODDARD LAW PLLC**

*/s/ Megan S. Goddard*

Megan S. Goddard, Esq.
[*Pro Hac Vice*]
39 Broadway, Suite 1540
New York, NY 10006
Telephone: (646) 504-8363
Facsimile: (212) 208-2914
Email: Megan@goddardlawnyc.com

*Attorneys for Plaintiff*
*Guy Washington*